UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN MCCORMACK, et al.,

                                Plaintiffs,

       v.

IBM,

                                Defendant.

No. 14-CV-3242 (KMK)

<u>OPINION AND ORDER</u>

---

<u>Appearances:</u>

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiffs*

Alison B. Marshall, Esq.
Jones Day
Washington, DC
*Counsel for Defendant*

Matthew W. Lampe, Esq.
Jones Day
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

       Plaintiffs John McCormack ("McCormack"), Mark Lingl ("Lingl"), and Ron Shelton

("Shelton") (collectively, "Plaintiffs") filed the instant Amended Complaint against International

Business Machines Corp. ("IBM" or "Defendant") on behalf of themselves and a class of

similarly-situated IBM employees and former employees.  The Amended Complaint alleges that

Defendant engaged in discriminatory practices in violation of the Age Discrimination in

Employment Act, 29 U.S.C. § 621, et seq. ("ADEA") and the New York State Human Rights

Law ("NYSHRL"), New York Executive Law § 296.  Before the Court is Defendant's Motion

For Judgment on the Pleadings pursuant to Federal Rules of Civil Procedure 12(c) as to Shelton and Lingl.  (*See* Mot. For Judgment on the Pleadings ("Mot.") (Dkt. No. 22).)  For the following reasons, Defendant's Motion is denied.

## I.  Background

### A.  Factual Background

#### 1.  Plaintiffs' Amended Complaint

The following facts are drawn from Plaintiffs' Amended Complaint and are taken as true for the purpose of resolving the instant Motion.  The Court also considers two documents attached to the Declaration of Matthew W. Lampe, as explained below.  McCormack, who was born on September 25, 1967, is a former employee of IBM who was laid off in December 2013. (First Amended Complaint ("Am. Compl.") ¶¶ 3–4 (Dkt. No. 20).)  Shelton, who was born on July 14, 1964, is a former IBM employee who was laid off in July 2013.  (*Id.* ¶¶ 5–6.)  Lingl, who was born on March 16, 1956, is a former IBM employee who was terminated from his position as an Advanced IT Specialist effective July 12, 2013.  (*Id.* ¶¶ 8, 10.)

Before his termination, McCormack worked at the IBM Semiconductor Manufacturing Facility at 2070 Route 52 in Hopewell Junction, New York.  (*Id.* ¶ 14.)  After being advised several months before his termination that he would be laid off in December 2013, McCormack searched for a comparable position and identified at least 15 internal positions at IBM.  (*Id.* ¶ 15.)  Yet when McCormack actively sought these positions, he was denied each one of them. (*Id.* ¶ 16.)  IBM managers and supervisors told McCormack that these positions had been targeted for young people who had graduated from college in 2012 or 2013.  (*Id.* ¶ 17.) McCormack responded that he was a 2012 college graduate, but he still received no offers that would allow for an internal transfer.  (*Id.* ¶ 18.)  Plaintiffs allege that McCormack had the

qualifications and technical skills to successfully fulfill the responsibilities of many of the positions that he sought.  (*Id.* ¶ 19.)

On September 12, 2011, IBM hired Shelton as a Technical Solutions Architect.  (*Id.* ¶ 21.)  Shelton satisfactorily performed the duties assigned to him, but, nonetheless, IBM terminated him effective July 12, 2013.  (*Id.* ¶ 22.)  Shelton's supervisor did not explain to Shelton why he had been terminated and, when she advised him of his termination, she began crying and stated that she would never had accepted her own promotion if she knew that she would have to fire Shelton.  (*Id.* ¶ 23.)  Prior to Shelton's termination, his second line manager emailed Shelton and other employees suggesting that they congratulate a first line manager who was retiring.  (*Id.* ¶ 24.)  Later, Shelton learned that the first line manager, a woman over 55 years of age, did not voluntarily retire, but, rather, was forced to leave IBM and was replaced by a younger Lab Services manager.  (*Id.* ¶ 25.)  After Shelton was terminated and signed a severance agreement and general release, IBM sought candidates for his former position and filled it with a much younger person.  (*Id.* ¶ 26.)  At the time he signed the general release, Shelton did not know that his position was being continued but rather understood, from IBM's public representations, that he had been terminated as part of a major corporate downsizing.  (*Id.* ¶ 27.)  Although Shelton qualified for and sought other positions that IBM advertised, he was never offered a chance to compete for any of them because he was not a recent college graduate. (*Id.* ¶¶ 28–29.)

Lingl worked for IBM from June 1, 1998 until June 28, 2002, when he was laid off, and again from October 16, 2006 until June 12, 2013, when IBM terminated Lingl by an email from his supervisor, Dawn Mack ("Mack").  (*Id.* ¶¶ 30–31.)  The email from Mack made no reference to any performance issues, but rather claimed that Lingl was being terminated as part of a broader fiscally driven "resource action," identified as the "S&D Global Techline and Channel

Technical Sales Resource Action," which IBM was implementing to "streamline operations and increase business productivity." (*Id.* ¶ 31.) At the time of his termination, Lingl's job performance was satisfactory, which was evidenced by the fact that he had received six "Excellence Awards" and a consequent bonus between November 30, 2011 and May 31, 2013. (*Id.* ¶ 32.)

At the time of their lay-offs, neither Shelton nor Lingl was aware that IBM intended to recruit and hire a large number of recent college graduates to replace them, but rather, because IBM announced that it was "streamlining" its work force, they understood that they were casualties of a resource action and IBM had no other work opportunities available. (*Id.* ¶¶ 33–34.) Plaintiffs allege that in 2013, IBM cut its older work force and then implemented a nationwide advertising campaign to replace the older workers with recent college graduates. (*Id.* ¶ 35; *see also id.* ¶ 12.) Such advertisements were nationwide in scope and reflected a like policy to discriminate against older workers and to exclude them from consideration for a range of jobs for which many would qualify. (*Id.* ¶ 13.) As part of this policy, despite encouraging displaced workers to locate other internal positions, IBM informed those it was terminating that it did not "practice bumping rights." (*Id.* ¶ 36 (internal quotation marks omitted).)[1] Plaintiffs allege that IBM implemented this termination, recruitment, and hiring campaign as a means of replacing older workers with younger workers and that the campaign was not informed by the

---

[1] Although the Amended Complaint states that "IBM informed those it was terminating that it does 'practice bumping rights[,]'" (*Id.* ¶ 36 (some internal quotation marks omitted), it is clear that Plaintiffs intended to include the word "not," as confirmed by their submissions of correspondence from Defendant noting that "IBM does not practice 'bumping rights[,]'" (Second Decl. of Matthew W. Lampe ("Second Lampe Decl.") Ex. A, at unnumbered 1 (Dkt. No. 30); *id.* Ex. B, at unnumbered 2.) "Bumping" is a practice "in which a laid-off or demoted worker displaces a worker in another job who has less seniority." Robert E. Weir, *Workers in America: A Historical Encyclopedia* 98 (rev. ed. 2013). Thus, under Defendant's stated policy, "regardless of your level of service, you do not have the option of assuming another position if it would, in turn, displace or 'bump' another regular IBM employee." (Second Lampe Decl. Ex. A, at unnumbered 1–2; *id.* Ex. B, at unnumbered 2.)

specific and relative qualifications of recently displaced older employees like Plaintiffs, or those of the younger employees that IBM intended to hire to replace the older employees. (*Id.* ¶ 37.)

As part of this plan, Plaintiffs allege that IBM offered Shelton and Lingl severance packages which they could access only if, within thirty days, they signed general releases freeing IBM from liability for, among other things, age discrimination. (*Id.* ¶ 38.) Specifically, Shelton and Lingl each signed a Resource Action Separation Agreement ("Separation Agreement"). (Decl. of Matthew W. Lampe ("Lampe Decl." Ex. A, at 2 ("Dkt. No. 24); *id.* Ex. B, at 1.) The Separation Agreement stated that "[b]y signing [it], [the employee] acknowledge[d] that [he] fully underst[ood] any and all rights [he has] with respect to the claims [he was] releasing, and that [he was] voluntarily signing th[e] Agreement without any threats, coercion or duress, whether economic or otherwise, and that [he] intend[ed] to by bound by the terms of th[e] Agreement." (*Id.* Ex. A, at 3; *id.* Ex. B, at 2.) Each Separation Agreement explained that the employee was "being offered payments and benefits as part of the resource action that [he] otherwise would not have been entitled to receive." (*Id.* Ex. A, at 2; *id.* Ex. B, at 1.) The Separation Agreement advised Lingl and Shelton to "thoroughly review and understand the effect of th[e] Agreement before [they] sign[ed] it[,]" and, if they did not understand the Separation Agreement, to "talk to a lawyer." (*Id.* Ex. A, at 2–3; *id.* Ex. B, at 1–2.) Moreover, the Separation Agreement provided that each Plaintiff had 45 days after he received the Separation Agreement or until his last day of employment to sign the Separation Agreement and gave each seven days after he signed the Separation Agreement to revoke it. (*Id.* Ex. A, at 3; *id.* Ex. B, at 2.)

Plaintiffs contend that IBM offered the severance packages fraudulently and in bad faith, because the premise of the offer was that IBM was engaged in a nationwide "resource action," not that the company was intentionally replacing older employees with younger employees.

(Am. Compl. ¶ 39.)  Shelton and Lingl allege that they would never have signed the general releases or accepted the severance payments had they known that IBM intended to replace them with recent college graduates.  (*Id.* ¶ 41.)  Finally, Plaintiffs allege that the positions offered to the young employees were not made available to Plaintiffs and others similarly situated in age. (*Id.* ¶ 45.)

### B.  Procedural History

Plaintiffs filed the original Complaint on May 5, 2014.  (Dkt. No. 1.)  Defendant filed an answer on June 20, 2014.  (Dkt. No. 12.)  On September 29, 2014, Plaintiffs filed the Amended Complaint, alleging violations of the ADEA and NYSHRL.  (Dkt. No. 20.)  Defendant filed an answer on October 16, 2014.  (Dkt. No. 21.)  Pursuant to a scheduling order dated September 19, 2014, (Dkt. No. 19), Defendant filed both its Motion For Judgment on the Pleadings as to Shelton and Lingl and its supporting papers on November 4, 2014, (Dkt. Nos. 22–24), Plaintiffs filed their Memorandum of Law in Opposition to the Motion on December 4, 2014, (Dkt. No. 25), and Defendant filed its reply on December 19, 2014, (Dkt. No. 26).  Upon the Court's entering an order on May 19, 2015 to request supplemental briefing on the question of whether the Separation Agreements complied with the requirements of the Older Workers Benefit Protection Act, (Dkt. No. 27), Plaintiffs submitted a supplemental brief on June 1, 2015, (Dkt. No. 28), and Defendant submitted a supplemental brief, (Dkt. No. 29), along with a supporting declaration, (Dkt. No. 30), the same day.

## II.  Discussion

### A.  Applicable Law

#### 1.  Standard of Review

"The standard of review on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is the same as the standard of review applied to a motion to

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Marte v. Safety Bldg. Cleaning Corp.*, No. 08-CV-1233, 2009 WL 2827976, at *1 (S.D.N.Y. Sept. 2, 2009); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) ("In deciding a Rule 12(c) motion, we employ the same standard applicable to dismiss pursuant to Rule 12(b)(6)." (alterations and internal quotation marks omitted)).  The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citations omitted).  Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

For the purpose of Defendant's Motion, the Court is required to consider as true the factual allegations contained in the Complaint.  *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to

Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same).  In deciding the Motion, the Court "must confine its consideration to facts stated on the face of the [C]omplaint, in documents appended to the [C]omplaint or incorporated in the [C]omplaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted) (applying standard to a Rule 12(b)(6) motion); *see also Smith v. City of New York*, No. 13-CV-2395, 2014 WL 490557, at *3 (E.D.N.Y. Sept. 30, 2014) ("When deciding a motion on the pleadings, the court must confine its consideration to the pleadings and their attachments, to documents . . . incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (alteration in original) (internal quotation marks omitted)).

### 2.  ADEA Claims

"The ADEA, enacted in 1967, generally forbids an employer 'to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age.'"  *Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 313 (2d Cir. 2011) (quoting 29 U.S.C. § 623(a)(1)).  "It is well established that the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)[,] applies to claims brought under the ADEA."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014). "Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination."  *Id.* at 168 (internal quotation marks omitted).  "To establish a prima facie case, a plaintiff with an age discrimination claim must show (1) that [he or] she was within the protected age group, (2) that [he or] she was qualified for the positon, (3) that [he or] she

experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (internal quotation marks omitted).  If the plaintiff satisfies this initial burden, "the defendant must then articulate some legitimate, nondiscriminatory reason for its action." *Delaney*, 766 F.3d at 168 (internal quotation marks omitted).  "When the employer meets its burden, the plaintiff can no longer rely on the prima facie case, but must prove that the employer's proffered reason was a pretext for discrimination." *Id.* (citations and internal quotation marks omitted).  Moreover, in light of the "Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 173 (2009), eliminating the mixed-motive analysis as to ADEA claims, a plaintiff bringing a disparate-treatment claim pursuant to the ADEA satisfies this burden by presenting facts, which taken in his [or her] favor, suffice to show that a triable issue exists as to whether his [or her] age was a but for cause of his [or her] termination." *Id.* (alterations and internal quotation marks omitted).[2]

     In 1990, Congress enacted the Older Workers Benefit Protection Act ("OWBPA"), which "amend[ed] the ADEA[] to impose specific requirements for releases covering ADEA claims." *Ridinger*, 651 F.3d at 313 (alteration and internal quotation marks omitted).  "A purported waiver of ADEA claims is governed by [OWBPA], which states that 'an individual may waive his rights only if the waiver is knowing and voluntary.'" *Wahab v. Estee Lauder Cos., Inc.*, No. 12-CV-3932, 2014 WL 4904592, at *16 (E.D.N.Y. July 17, 2014) (quoting 29 U.S.C. § 626(f)(1)), *adopted by* 2014 WL 4906511 (E.D.N.Y. Sept. 30, 2014) (some internal quotation

---

     [2] A plaintiff pursuing an ADEA claim need not plead a prima facie case under *McDonnell Douglas* in order to survive a motion to dismiss.  *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002) (holding "an employment discrimination plaintiff need not plead a prima facie case of discrimination" at the motion to dismiss stage).  Rather, "the 'prima facie case' requirement . . . applie[s] only at the summary judgment phase." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).

marks omitted).  The OWBPA provides that "a waiver may not be considered knowing and

voluntary unless at a minimum" the following conditions are met:

> (A) the waiver is part of an agreement between the individual and the employer
>       that is written in a manner calculated to be understood by such individual, or
>       by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the
>       waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in
>       addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to
>       executing the agreement;
>
> (F) (i) the individual is given a period of at least 21 days within which to consider
>       the agreement; or
>       (ii) if a waiver is requested in connection with an exit incentive or other
>       employment termination program offered to a group or class of employees,
>       the individual is given a period of at least 45 days within which to consider
>       the agreement;
>
> (G) the agreement provides that for a period of at least 7 days following the
>       execution of such agreement, the individual may revoke the agreement, and
>       the agreement shall not become effective or enforceable until the revocation
>       period has expired;
>
> (H) if a waiver is requested in connection with an exit incentive or other
>       employment termination program offered to a group or class of employees,
>       the employer (at the commencement of the period specified in subparagraph
>       (F)) informs the individual in writing in a manner calculated to be understood
>       by the average individual eligible to participate, as to—
>           (i) any class, unit, or group of individuals covered by such program, any
>           eligibility factors for such program, and any time limits applicable to such
>           program; and
>           (ii) the job titles and ages of all individuals eligible or selected for the
>           program, and the ages of all individuals in the same job classification or
>           organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f).  "The OWBPA strictures on waivers are strict and unqualified[,]" and "[a]n

employee may not waive an ADEA claim unless the employer complies with the statute."

*Ridinger*, 651 F.3d at 314 (alteration, citations, and internal quotation marks omitted).  The
Equal Opportunity Commission ("EEOC") has promulgated regulations pursuant to the OWBPA
that "repeat and reflect these strictures."  *Id.*

      Moreover, "the OWBPA requirements set out in § 626(f) are only minimum requirements
to find a waiver knowing and voluntary, and . . . the ultimate test remains whether that waiver
was *in fact* knowing and voluntary."  *Sheridan v. McGraw-Hill Cos., Inc.*, 129 F. Supp. 2d 633,
638 (S.D.N.Y. 2001); *see also Clark v. Buffalo Wire Works Co., Inc.*, 3 F. Supp. 2d 366, 372
(W.D.N.Y. 1998) ("Whereas a wavier claim under the ADEA is valid only if it strictly complies
with the requirements of the OWBPA, the validity of a release under New York law is
determined based on common law contract principles." (internal citation omitted)).  "The burden
of proving that a claimed 'waiver was knowing and voluntary' within the meaning of the
OWBPA is on 'the party asserting the validity of [the] waiver.'"  *Ridinger*, 651 F.3d at 314
(quoting 29 U.S.C. § 626(f)(3)); *see also Wahab*, 2014 WL 4904592, at *17 (same).  To
determine whether a waiver is knowing or voluntary, "[d]istrict courts review the totality of the
circumstances."  *Callahan v. Unisource Worldwide, Inc.*, 451 F. Supp. 2d 428, 434 (D. Conn.
2006) (internal quotation marks omitted).  The EEOC's regulations provide that facts and
circumstances that bear on the question of whether a waiver is knowing and voluntary include
whether "there is a material mistake, omission, or misstatement in the information furnished by
the employer to an employee in connection with the waiver."  29 C.F.R. § 1625.22(a)(3); *see
also O'Grady v. Middle Country Sch. Dist. No. 11*, 556 F. Supp. 2d 196, 201 (E.D.N.Y. 2008)
("Nonstatutory circumstances, such as fraud, duress, or coercion in connection with the
execution of the waiver, may render an ADEA waiver not knowing and voluntary." (alteration
and internal quotation marks omitted)).  Indeed, "[t]he legislative history of the OWBPA
indicates that the fundamental purpose of its waiver provisions is to ensure that an older worker

who is asked to sign an ADEA waiver does so in the absence of fraud, duress, coercion, or mistake of material fact." *Butcher v. Gerber Prods. Co.*, 8 F. Supp. 2d 307, 319 (S.D.N.Y. 1998).

### 3.  NYSHRL Claims

"An age discrimination claim under [New York State Executive Law § 296] is subject to the same analysis as [an] ADEA claim." *Abrahamson v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 01-CV-10859, 2002 WL 1354711, at *9 (S.D.N.Y. June 21, 2002).  Nevertheless, "the New York State . . . age discrimination statutes are not governed by the OWBPA." *Sheridan*, 129 F. Supp. 2d at 639; *see also Branker v. Pfizer*, 981 F. Supp. 862, 867 (S.D.N.Y. 1997) (same).  Instead, the enforceability of a release under New York law "is governed by ordinary contract law principles." *Cordoba v. Beau Dietl & Assocs.*, No. 02-CV-4951, 2003 WL 22902266, at *6 (S.D.N.Y. Dec. 8, 2003).  "Releases are not to be disregarded and, in the absence of fraud, duress, illegality or mistake, a general release bars an action on any cause of action arising prior to its execution." *Clark*, 3 F. Supp. 2d at 372–73 (alteration, citation, and internal quotation marks omitted).  Thus, "a release that is clear and unambiguous and which is knowingly and voluntarily entered into will be enforced." *Laramee v. Jewish Guild for Blind*, 72 F. Supp. 2d 357, 359 (S.D.N.Y. 1999); *see also Cordoba*, 2003 WL 22902266, at *6 (same).

### 4.  Fraudulent Inducement

"To state a claim for fraudulent inducement under New York law, a plaintiff must show: (1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 580 (2d Cir. 2005); *see also Barnett v. Countrywide Bank, FSB*, 60 F. Supp. 3d 379, 390 (E.D.N.Y. 2014) (explaining that a party claiming fraudulent

inducement must show "(1) a material misrepresentation or omission that induced the party to sign the contract; (2) scienter; (3) reliance; and (4) injury." (italics and internal quotation marks omitted)); *Schwartzco Enters. LLC v. TMH Mgmt, LLC*, 60 F. Supp. 3d 331, 344 (E.D.N.Y. 2014) (same).  Although Federal Rule of Civil Procedure 8 only requires "a short and plain statement" of the plaintiff's claim, Rule 9(b) requires that "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud."  To satisfy Rule 9(b), "the plaintiff must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  Moreover, although "[u]nder Rule 9(b), '[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally,' . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting Fed. R. Civ. P. 9(b)) (citation and some internal quotation marks omitted).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging recklessness."  *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 247 (S.D.N.Y. 2011) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1995)).  Nevertheless, "Rule 9(b) does not displace Rule 8(a); rather, the Court must balance the requirements of Rule 9(b) and their overall purposes with the requirements of notice pleading under Rule 8(a)."  *Schwartzco Enters.*, 60 F. Supp. 3d at 344–45 (alteration and internal quotation marks omitted).

    B.  Application

    IBM moves for judgment on the pleadings on the basis that, because Shelton and Lingl signed the Separation Agreements, Plaintiffs cannot recast their discrimination claims as claims

of fraudulent inducement, and that, in any event, the allegations of fraudulent inducement do not

meet the heightened pleading standards of Rule 9(b).

### 1. Consideration of Separation Agreements

To begin, IBM asks the Court to consider the Separation Agreements in resolving the

instant Motion because they are integral to the Complaint.  (Def.'s Mem. of Law in Supp. of

Mot. For Judgment on the Pleadings ("Def.'s Mem.") 3 n.3 (Dkt. No. 23).)  "The Second Circuit

has explained that a 'necessary prerequisite for the exception' that materials integral to the

complaint may be considered on a motion to dismiss [or for judgment on the pleadings] 'is that

the plaintiff *rely* on the terms and effect of the document in drafting the complaint . . .; mere

notice or possession is not enough.'"  *Alvarez v. County of Orange*, — F. Supp. 3d — , 2015 WL

1332347, at *9 (S.D.N.Y. Mar. 25, 2015) (quoting *Glob. Network Commc'ns, Inc. v. City of New

York*, 458 F.3d 150, 156 (2d Cir. 2006)) (some internal quotation marks omitted).  Moreover,

"[i]n most instances where this exception is recognized, the incorporated material is a contract or

other legal document containing obligations upon which the plaintiff's complaint stands or falls,

but for some reason—usually because the document, read in its entirety, would undermine the

legitimacy of the plaintiff's claim—was not attached to the complaint."  *Glob. Network

Commc'ns*, 458 F.3d at 157.  Finally, "even if a document is 'integral' to the complaint, it must

be clear on the record that no dispute exists regarding the authenticity or accuracy" or "relevance

of the document."  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, the Complaint explicitly references the "General Releases freeing the employer for

liability for, inter alia, age discrimination" that Shelton and Lingl signed.  (Am. Compl. ¶ 38

(italics omitted).)  Moreover, the Separation Agreements are integral to Plaintiffs' claim that they

were fraudulently induced to sign them and that the general releases contained in the agreements

"should be set aside and given no force and effect as violative of public policy and offered in

furtherance of a then[-]unknown . . . , but intentional, scheme to rid IBM of 'older workers.'"
(*Id.* ¶ 42.)  Finally, Plaintiffs do not object or otherwise argue that the Separation Agreements
should not be considered at this stage of the case.  Accordingly, because the Separation
Agreements are integral to the Complaint, the Court considers them in resolving the instant
Motion.  *See Pesserillo v. Nat'l Grid*, — F. Supp. 3d — , 2015 WL 136030, at *2–3 (E.D.N.Y.
Jan. 8, 2015) (holding that the relevant agreement and the general release that the plaintiff
entered into with the defendant was incorporated in and integral to the plaintiff's complaint
advancing claims of disability discrimination even though the plaintiff omitted any reference to it
in the complaint); *O'Grady*, 556 F. Supp. 2d at 200 n.1 (explaining that the court considered the
incentive plan and waiver at issue in the plaintiff's OWBPA claim because they were "clearly
incorporated in the complaint by reference and [were] integral to the complaint").

### 2.  Minimum Requirements Under OWBPA

In their Amended Complaint, Plaintiffs do not specifically allege that Defendant failed to
comply with the minimum requirements under OWBPA.  The few courts that have addressed
whether it is appropriate to examine the validity of a waiver absent allegations that a defendant
did not satisfy the statutory requirements under OWBPA have reached different conclusions.
*Compare Taylor v. Northrop Grumman Sys. Corp.*, No. 13-CV-1832, 2013 WL 4781094, at *2
(D. Md. Sept. 5, 2013) (holding that "[w]hile the [a]greement does not mention that [the]
[d]efendant provided [the] [p]laintiff with information about any class, unit, or group of
individuals covered by such program, any eligibility factors for such program, or any time limits
applicable to such programs, [the] [p]laintiff has not alleged that [the] [d]efendant failed to
comply with this requirement . . . [and] [t]herefore, none of [the] [p]laintiff's allegations would
support a finding that the [w]aiver failed to comply with the OWBPA's requirements") *with*
*Allen v. Chanel Inc.*, No. 12-CV-6758, 2013 WL 2413068, at *9 (S.D.N.Y. June 4, 2013) (noting

that although "[n]either party contend[ed] that [the] [p]laintiff's waiver was unknowing, unwillful, or involuntary . . . . given the public policy concerns animating the waiver requirement, the [c]ourt must assess whether [the] [p]laintiff's waiver satisfie[d] the relevant standards" and finding, in the context of a summary judgment motion, the waiver was not knowing and voluntary).  This Court agrees with the district court in *Allen* that even absent explicit allegations that a waiver is insufficient under the OWBPA, a court must determine whether the waiver satisfies the statutory requirements before concluding that it bars a plaintiff's ADEA claim.  As the Supreme Court has made clear, a "release can have no effect on [a plaintiff's] ADEA claim unless it complies with the OWBPA."  *Oubre v. Energy Operations, Inc.*, 522 U.S. 422, 427 (1998).  Indeed, "[t]he absence of even one of the OWBPA's requirements invalidates a waiver."  *Butcher*, 8 F. Supp. 2d at 314; *see also Suhy v. AlliedSignal*, 44 F. Supp. 2d 432, 436 (D. Conn. 1999) ("Strict compliance with each provision of the OWBPA is . . . necessary, as a release cannot be deemed knowing and voluntary unless all of the technical requirements of the OWBPA have first been satisfied." (internal quotation marks omitted)).  Moreover, invocation of a waiver is an affirmative defense, *see Whitehead v. Okla. Gas & Elec. Co.*, 187 F.3d 1184, 1191 (10th Cir. 1999) ("OWBPA's establishment of minimum waiver requirements can be a shield for plaintiffs in an ADEA action when an employer invokes the waiver as an affirmative defense"), and, as noted, Defendant ultimately has the burden of proof to show that the waiver is valid, *see Suhy*, 44 F. Supp. 2d at 434 ("The party asserting the validity of the waiver has the burden of proving that the waiver was knowing and voluntary.").  Accordingly, the Court turns to whether the Separation Agreements satisfy the OWBPA.

The Separation Agreements are written plainly; they specifically refer to claims under the ADEA, (Lampe Decl. Ex. A, at 3; *id.* Ex. B, at 2); they provide that Shelton and Lingl do not waive any claims that might "arise after the date [they] sign[ed] the Agreement," (*Id.* Ex. A, at

3–4; *id.* Ex. B, at 2–3); and Shelton and Lingl were "offered payments and benefits as part of the resource action that [they] otherwise would not have been entitled to receive," (*Id.* Ex. A, at 3; *id.* Ex. B, at 2). Moreover, the Separation Agreements advised Shelton and Lingl to consult an attorney before signing the agreement, gave them 45 days to consider the Agreements, and allowed them to revoke the Agreements seven days after they signed it. (*Id.* Ex. A, at 3–4; *id.* Ex. B, at 2–3.) Accordingly, on their face, the Separation Agreements comply with the first seven requirements mandated by the OWBPA. *See* 29 U.S.C. § 626(f)(1)(A)–(G).

It is not clear, however, whether the Separation Agreements satisfy the requirements under 29 U.S.C. § 626(f)(1)(H)(i). As noted above, § 626(f)(1)(H)(i) provides that:

> [T]he employer (at the commencement of the period specified in paragraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to . . . any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program.

The EEOC's regulations provide that "[a] 'program' [for the purpose of 29 U.S.C. § 626(f)(1)(H)] exists when an employer offers additional consideration for the signing of a waiver pursuant to an exit incentive or other employment termination (e.g., a reduction in force) to two or more employees." C.F.R. § 1625.22(f)(1)(iii)(B) (italics omitted).

Defendant acknowledges that the Separation Agreements were requested in connection with an employment termination program, and thus there is no dispute that § 626(f)(1)(H) applies here. (Def.'s Mem. 6.) Nevertheless, in support of its Motion, Defendant points to nothing in the Separation Agreements that contain the information mandated by § 626(f)(1)(H) and, indeed, there is nothing in the Separation Agreements that satisfies these requirements. In response to the Court's order requesting supplemental briefing on whether Defendant complied with this eighth factor under the OWBPA, Defendant submitted two separate Employee Information Packages and accompanying memoranda addressed to Shelton and Lingl, which

17

were dated the same day as the Separation Agreements (Second Lampe Decl. Ex. A; *id.* Ex. B).

For one, it is not clear that these materials are appropriately considered in resolving the instant Motion.  Unlike the Separation Agreements, which were relied on in the Amended Complaint, as discussed above, Plaintiffs do not rely on, or even reference, the Employee Information Packages and accompanying memoranda in their Amended Complaint.  Mere notice or possession of the materials is insufficient to consider the documents at this stage in the Action. *See Glob. Network Commc'ns*, 458 F.3d at 156 (explaining that "mere notice or possession" of documents not otherwise relied upon by a plaintiff should not be considered in resolving a motion to dismiss).

Assuming, arguendo, that it is appropriate to consider the materials that Defendant submitted in its supplemental briefing, judgment on the pleadings is not warranted without discovery.  In his memorandum, Shelton was informed that "IBM [was] conducting a resource action in STG Lab Services & Technical Training, excluding employees participating in the Transition to Retirement program," that was "being implemented in an effort to streamline operations and increase business productivity."  (Second Lampe Decl. Ex. A, at unnumbered 1.) Likewise, Lingl was informed that "IBM [was] conducting a resource action in S&D Global Techline and Channel Technical Sales, excluding employees participating in the Transition to Retirement program," which was "being implemented in an effort to streamline operations and increase business productivity."  (Second Lampe Decl. Ex. B, at unnumbered 1.)  Defendant contends that these disclosures satisfied its obligation to inform Shelton and Lingl of the class, unit, or group of individuals covered by the relevant program.  (*See* Def.'s Supplemental Br. Pursuant to the Court's Order of May 19, 2015 ("Def.'s Supplemental Br.") 2 (Dkt. No. 29).)  In contrast, Plaintiffs argue that despite this information, IBM's "disclosure falls short" because it failed to indicate the "breadth or scope of its personnel action" and only provided Shelton and

Lingl with information relevant to their own units.  (Pls.' Supplemental Br. to the Court's Order of May 19, 2015 ("Pls.' Supplemental Br.") 2 (Dkt. No. 28).)

"[I]n evaluating whether the employer's § 626(f)(1)(H) disclosure was sufficient, the relevant question is whether the employees were 'provided with the age and job-title information that would be relevant if the employees were to bring an age discrimination claim arising out of their termination.'"  *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 380 (E.D. Pa. 2014) (quoting *Adams v. Moore Bus. Forms, Inc.*, 224 F.3d 324, 329 (4th Cir. 2000)).  The requirements in § 626(f)(1)(H) are intended to "permit older workers to make more informed decisions [regarding waiver of their ADEA claims] in group termination and incentive programs."  S. Rep. No. 101-263 (1990), 1990 WL 171790, at *1538; *see* 29 C.F.R. § 1625.22(f)(1)(iv) ("The purpose of the informational requirements is to provide an employee with enough information regarding the program to allow the employee to make an informed choice whether or not to sign a waiver agreement."); *see also Burlison v. McDonald's Corp.*, 455 F.3d 1242, 1247 (11th Cir. 2006) (holding that the purpose of § 626(f)(1)(H) is "to ensure that older employees are provided with information necessary to evaluate any potential ADEA claims they may have before deciding to release them").  Because "the terms of the programs generally are not subject to negotiation between the parties," and "employees affected by these programs have little or no basis to suspect that action is being taken based on their individual characteristics," but rather "the employer generally advises them that the termination is not a function of their individual status . . . the need for adequate information and access to advice before waivers are signed is especially acute."  S. Rep. No. 101-263, 1990 WL 171790, at *1538.

The terms class, unit, or group in § 626(f)(1)(H)(i) "refer to examples of categories or groupings of employees affected by a program within an employer's particular organizational structure."  29 C.F.R. § 1625.22(f)(3)(i)(A).  The EEOC's regulations further explain that:

> When identifying the scope of the "class, unit, or group," and "job classification
> or organizational unit," an employer should consider its organizational structure
> and decision-making process.   A "decisional unit" is that portion of the
> employer's organizational structure from which the employer chose the persons
> who would be offered consideration for the signing of a waiver and those who
> would not be offered consideration for the signing of a waiver.   The term
> "decisional unit" has been developed to reflect the process by which an employer
> chose certain employees for a program and ruled out others from that program.

*Id.* § 1625.22(f)(3)(i)(B).  Moreover, the regulations advise that "[w]hen identifying the

population of the decisional unit, the employer acts on a case-by-case basis, and thus the

determination of the appropriate class, unit, or group, and job classification or organizational unit

for purposes of [§ 626(f)(1)(H)(i)] also must be made on a case-by-case basis."  *Id.*

§ 1625.22(f)(3)(ii)(A).  Courts have found that an employer's failure to inform an employee of

the decisional unit that is at issue in a reduction in force violates the OWBPA and therefore

invalidates the waiver as a matter of law.  *See Kruchowski v. Weyerhaeuser Co.*, 446 F.3d 1090,

1094 (10th Cir. 2006) (holding that the release at issue was ineffective as a matter of law because

the "decisional unit" of which the plaintiff was notified and the actual "decisional unit" that the

defendant considered were two separate groups, such that "the information [the] defendant gave

to [the] plaintiff was inaccurate."); *Ribble v. Kimberly-Clark Corp.*, No. 09-CV-643, 2012 WL

589252, at *21 (E.D. Wisc. Feb. 22, 2012) (explaining that the defendant's "failure to accurately

describe the decisional unit in its disclosure renders the waivers signed by the employee

invalid").

Plaintiffs argue that they "were not informed of the scope of the 'program,' but only the

impact of the program on the units they were part of[,] [which] violated the OWBPA as it did not

provide either the scope of information which would have allowed them to understand the scope

of the involuntary termination 'program' and its ageist dimensions."  (Pls.' Supplemental Br. 3.)

Defendant claims that its disclosures represented the individuals covered by the relevant resource

20

actions.  (Def.'s Supplemental Br. 2.)  Without further fact-finding, the Court at this point is

unable to resolve the Parties' dispute as to whether Defendant correctly identified and defined

the decisional unit that it considered in terminating Shelton and Lingl.  *Cf. Wahab*, 2014 WL

4904592, at *18 (deciding, on a motion for summary judgment, that "based on the . . . record, the

[s]eparation [a]greement satisfie[d] the factors enumerated in 29 U.S.C. § 626(f)(1)" in part

because "[s]ignificantly, the [a]greement informed [the plaintiff] in writing in a manner

calculated to be understood by the average individual eligible to participate that (1) his

termination was part of a reduction in force being implemented in connection with the [relevant]

facility, (2) all regular employees at [the relevant] facility were considered for participation, and

(3) the job titles and ages of all employees who were considered and selected for [the] reduction

and who were eligible for severance packages were listed in the [a]ppendix to the [a]greement");

*Butcher*, 8 F. Supp. 2d at 312–13 (converting a motion for preliminary injunction to a motion for

summary judgment and holding that the relevant waiver failed to meet OWBPA's requirements).

Accordingly, it is open to dispute whether the Separation Agreements constitute valid waivers of

Plaintiffs' ADEA claims, and the Motion as to the ADEA claims is therefore denied.

### 3.  Plaintiff's Allegations of Fraudulent Inducement

Although the Court holds that factual issues as to whether Defendant complied with the

OWBPA preclude it from granting the Motion as to Plaintiffs' federal claims, the Court also

addresses Defendant's arguments that "Plaintiffs cannot recast their claims of employment

discrimination as fraudulent inducement," (Def.'s Mem. 7), and that, in any event Plaintiffs fail

to adequately plead fraud pursuant to Federal Rule of Civil Procedure 9(b).  Plaintiffs argue that

Shelton's and Lingl's claims are not barred by the Separation Agreements because Defendant

"fraudulently induced them into signing the waivers by making active misrepresentations and

misstatements, thereby rendering the [Separation Agreements] involuntary or unknowing under

21

the OWBPA."  (Pls.' Mem. Of Law in Response to Def.'s Mot. For Partial Judgment on the

Pleadings as to the Claims of Pls.' Ronald Shelton and Mark Lingl ("Pls.' Mem.") 8 (Dkt. No.

25).)  Defendant claims that "allowing a plaintiff 'to invalidate a waiver' by alleging that, at the

time he signed the release, he was unaware he was being discriminated against would 'preclude[]

the possibility of ever having an enforceable waiver of discrimination claims.'"  (Def.'s Mem. 10

(quoting *Sheridan*, 129 F. Supp. 2d at 633)).

     As noted above, "circumstances[] such as fraud, duress, or coercion[,] in connection

with the execution of [a] waiver, may render an ADEA waiver not knowing and voluntary."

*O'Grady*, 556 F. Supp. 2d at 201; *accord Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1229

(10th Cir. 1999) (same).  Here, Shelton and Lingl allege that they did not knowingly and

voluntarily execute the Separation Agreements because they were fraudulently induced into

signing them.  In particular, Plaintiffs claim that "[a]t the time of their lay-offs,

neither . . . Shelton nor . . . Lingl was aware that IBM intended to recruit and hire a large number

of recent college graduates to take jobs they had filled, and could have continued to fill."  (Am.

Compl. ¶ 33.)  Instead, "concurrent with their lay-offs and those of other similarly[] situated

workers, IBM announced that it was 'streamlining' its work force," which Plaintiffs "reasonably

understood" to mean "that they were casualties of that resource action and . . . IBM had no other

work opportunities for them."  (*Id.* ¶ 34.)

     Defendant would have the Court apply the reasoning in *Sheridan* and *Frumkin v.*

*International Business Machines Corporation*, 801 F. Supp. 1029 (S.D.N.Y. 1992), to Plaintiffs'

claims in resolving the instant Motion.  In *Sheridan*, the district court granted the defendant's

motion for summary judgment because it found that the plaintiff's ADEA claims were barred by

the waiver and release of claims that he signed before his termination.  129 F. Supp. 2d at 639.

Like the allegations here, the plaintiff in *Sheridan* alleged that the defendant "deliberately

misrepresented the facts surrounding his discharge so as to fraudulently induce him to sign the waiver and release of claims,"— specifically that the defendant's "statement that his termination was the result of a reorganization was misleading." *Id.* at 638.  After examining evidence of organizational charts of the defendant's business before and after the reorganizations, the *Sheridan* court concluded that "the evidence adduced in support of [the] motion [for summary judgment] reveal[ed] precisely the contrary." *Id.*  The court then explained that the plaintiff's "apparently sincere belief that his termination was the product of unlawful discrimination is insufficient to support an allegation of fraudulent inducement *when no other evidence support[ed] this claim*." *Id.* at 638–39 (emphasis added).  Similarly, in *Frumkin*, the court granted the defendant's motion for summary judgment on the plaintiff's ADEA claims because the plaintiff signed a release of his claims.  801 F. Supp. at 1042.  The district court rejected the plaintiff's fraudulent inducement claim because it found that the plaintiff "adduced no evidence of any genuinely disputed factual issue that the purported elimination of the [plaintiff's department] . . . amounted to a subterfuge to induce [the p]laintiff's execution of the release and separation from [the defendant]." *Id.*[3]

Here, like the plaintiffs in *Sheridan* and *Frumkin*, Plaintiffs claim that the Defendant fraudulently induced them to sign the Separation Agreements.  Rather than allowing Shelton and Lingl to proceed with discovery to support their claims, however, Defendant urges the Court to grant the Motion because "Plaintiffs cannot recast their claims of employment discrimination as fraudulent inducement."  (Def.'s Mem. 7.)  If Plaintiffs were only to allege that they believed

---

[3] Defendant also relies on *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459 (2d Cir. 1998), in which the Second Circuit upheld the district court's grant of summary judgment for the defendant because the termination agreement that the plaintiff signed was knowingly and voluntarily entered into, and thus barred his discrimination claims. *Id.* at 463.  Here, as discussed further, the Court cannot determine whether the waiver was knowingly and voluntarily entered based solely on the pleadings.

that their termination was a result of discrimination, Defendant's argument may have had merit. However, Plaintiffs complain that they were fraudulently induced to sign the Separation Agreements based on IBM's misrepresentations about the streamlining of its work force. Whether Defendant made misrepresentations in connection with the Separation Agreements bears on the question of whether the waivers were knowing and voluntary, or, more to the point, whether Defendant can meet its burden of substantiating this affirmative defense.  *See* 29 C.F.R. § 1625.22(a)(3) ("Other facts and circumstances may bear on the question of whether the waiver is knowing and voluntary, as, for example, if there is a material mistake, omission, or misstatement in the information furnished by the employer to an employee in connection with the waiver.").  Unsurprisingly, "[t]he validity of a release is a particularly fact-intensive inquiry." *Lamberti v. Motorola Sols., Inc.*, No. 12-CV-2472, 2014 WL 1224501, at *6 (S.D.N.Y. Mar. 24, 2014) (internal quotation marks omitted); *cf. Ascent Healthcare Sols., Inc. v. Dumont*, No. 10-CV-277, 2012 WL 1599868, at *5 (D. Vt. May 7, 2012) (explaining, in the context of a release of Title VII claims, that "where the operative facts are not disputed, the court may decide the [validity of a release] as a question of law").  Accordingly, the Court cannot determine from the pleadings alone whether Shelton and Lingl signed the Separation Agreements knowingly and voluntarily, and thus cannot resolve the factual issue of whether the waivers are enforceable.  *See O'Grady*, 556 F. Supp. 2d at 201 (denying the defendant's motion to dismiss because "the plaintiff must have the opportunity to conduct discovery . . . in order for the [c]ourt to determine whether the waiver was knowing and voluntary under the totality of circumstances"); *Callahan v. Unisource Worldwide, Inc.*, No. 01-CV-1205, 2003 WL 1714369, at *3 (D. Conn. Mar. 27, 2003) (denying the defendant's motion to dismiss the ADEA claim because the plaintiff alleged that the defendant induced him to sign the severance agreement and waiver by misrepresenting

the benefits he would receive by retiring and "such allegations [were] sufficient to defeat a conclusion that he knowingly and voluntarily waived his ADEA claim").

Next, Defendant argues that "Plaintiffs have failed to allege facts sufficient to show that they were fraudulently induced to sign the Separation Agreements." (Def.'s Mem. 11.)  More specifically, Defendant first claims that Plaintiffs fail to identify the statements that they allege were made, identify the speaker, or state where and when the statements were made.  (*Id.* at 13.) The Court disagrees.  As explained above, "[f]raudulent inducement claims are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)," *Eaves*, 785 F. Supp. 2d at 246–47, and therefore Plaintiffs "must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent,'" *First Hill Partners*, 52 F. Supp. 3d at 637 (quoting *Rombach*, 355 F.3d at 170).  Furthermore, the Amended Complaint "must be particular enough to satisfy the three goals of Rule 9(b): (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits." *CreditSights, Inc. v. Ciasullo*, No. 05-CV-9345, 2008 WL 4185737, at *9 (S.D.N.Y. Sept. 5, 2008).  Moreover, the Court analyzes the sufficiency of the allegations of fraud based on  "the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties[,] and the determination of how much circumstantial detail is necessary to give notice to the [Defendant] and enable [it] to prepare a responsive pleading." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12-CV-6811, 2013 WL 791462, at *9 (S.D.N.Y. Mar. 5, 2013) ("It is only common sense that the sufficiency of the pleadings under Rule 9(b) may depend upon the nature of the case . . . ." (internal quotation marks omitted)).

25

Here, Lingl alleges that Mack's email, sent on June 12, 2013, informed Lingl that he was "being terminated as part of a broader fiscally-driven 'resource action,' identified as the 'S&D Global Techline and Channel Technical Sales Resource Action (STGE)' which IBM allegedly was implementing 'to streamline operations and increase business productivity.'" (Am. Compl. ¶ 31.)  There is no doubt, based on this allegation, that Lingl identifies the statements that he "contends were fraudulent," *First Hall Partners*, 52 F. Supp. at 637 (internal quotation marks omitted), identifies the speaker, specifically Mack, and provides the time and manner in which the statements were made, *see id.*

As Defendant points out, Shelton's allegations of fraud are less specific.  (Def.'s Mem. 13.)  Indeed, Shelton claims that "[i]n advising him of his termination, [his] supervisor offered no explanation." (Am. Compl. ¶ 23.)  Nevertheless, Shelton alleges that "[a]t the time he signed the general release, [he] did not know that his position was being continued and understood, from IBM's public representations, that he had been terminated as part of a major corporate down-sizing." (*Id.* ¶ 27.)  Shelton and Lingl both allege that, "concurrent with their lay-offs and those of other similarly-situated workers, IBM announced that it was 'streamlining' its work force, [which] plaintiffs reasonably understood [to mean] that they were casualties of that resource action." (*Id.* ¶ 34.)  Moreover, in 2013, "despite apparently encouraging displaced workers to locate other internal positions, IBM informed those it was terminating that it does [not] 'practice bumping rights.'" (*Id.* ¶ 36 (some internal quotation marks omitted)).  Finally, Plaintiffs allege that the severance packages they received were premised on "the claim that [Defendant] was engaging in a nationwide 'resource action.'" (*Id.* ¶ 39.)  Although these allegations are somewhat general, the Court finds that in the context of Plaintiffs' other claims they are sufficiently specific under Rule 9(b) "to provide [Defendant] with fair notice of the claims against it." *CreditSights*, 2008 WL 4185737, at *9.  It is clear from these allegations that

26

Plaintiffs contend that Defendant's representations that it was terminating employees as part of a major corporate downsizing and its statements that it was "streamlining" its workforce and "engaging in a nationwide 'resource action'" were fraudulent, thus meeting the first requirement of Rule 9(b). *See First Hill Partners*, 52 F. Supp. at 637 (explaining that a plaintiff must "specify the statements that the plaintiff contends were fraudulent" (internal quotation marks omitted)).  Defendant claims that Shelton "makes no effort to identify the speaker who told him that he was being terminated as part of . . . downsizing, or to state when and where that statement was made."  (Def.'s Mem. 13 (alterations and internal quotation marks omitted)).  The gist of Shelton's claims, however, is that he was misled by IBM's public representations that the company was downsizing at the time that he signed the Separation Agreement.  Although Shelton may have difficulty ultimately showing reliance on IBM's public representations, it is clear that he alleges the speaker of the statements at issue to be IBM.  Moreover, the Amended Complaint makes clear that the representation of downsizing was made "[a]t the time [Shelton] signed the general release," (Am. Comp. ¶ 27), which was July 12, 2013, (*see* Lampe Decl. Ex. A, at 4.)  Therefore, contrary to Defendant's contention, Plaintiffs' allegations satisfy the first three requirements under Rule 9(b).

Defendant also argues that "Plaintiffs have failed to allege facts demonstrating that [the] alleged misrepresentation[s] [are] 'untrue.'"  (Def.'s Mem. 13.)  Again, "[t]o state a claim for fraudulent inducement under New York law, a plaintiff must show: (1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury."  *Aetna Cas. & Sur. Co.*, 404 F.3d at 580; *see also Glob. Energy & Mgmt., LLC v. Xethanol Corp.*, No. 07-CV-11049, 2009 WL 464449, at *2 (S.D.N.Y. Feb. 24, 2009) (same).  As explained above, Plaintiffs allege that IBM made material

representations that it was "streamlining" its workforce, thus satisfying the first element. As to the second element, this is not the case where Plaintiffs "fail[] to explain in what respects the statements at issue were untrue." *Glob. Energy & Mgmt.*, 2009 WL 464449, at *3. Rather, Plaintiffs allege that the statements discussed above were fraudulent because while IBM represented that it was "streamlining" its workforce and had no other employment opportunities for Plaintiffs, in fact "IBM intended to recruit and hire a large number of recent college graduates to take jobs [Plaintiffs] had filled, and could have continued to fill." (Am. Compl. ¶¶ 33–34.) Although Defendant claims that its representation of "streamlining" its workforce is not inconsistent with its campaign to recruit and hire new workers, Plaintiffs allege otherwise. Plaintiffs also allege that IBM knew that its representations about its practice of streamlining and downsizing were untrue because it planned to hire younger workers to replace Plaintiffs, that the statements were offered to induce Plaintiffs into signing the Separation Agreements to limit IBM's ADEA liability, and that Plaintiffs relied on these representations in signing the Separation Agreements. (Compl. ¶¶ 37–45.) Plaintiffs' allegations are therefore sufficient to state a claim of fraudulent inducement. Whether Plaintiffs can substantiate these claims is a matter for another day.

## III. Conclusion

For the foregoing reasons Defendant's Motion is denied. The Clerk of Court is respectfully requested to terminate the pending Motion. (Dkt. No. 22.)

SO ORDERED.

DATED:     November 9 , 2015
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

28